IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

        Plaintiff,

  v.

Liban Yasin Alishire (1),

        Defendant.

Case No. 22-CR-222 (1) (NEB/TNL)

**DEFENDANT LIBAN ALISHIRE'S
REPLY MEMORANDUM TO
MOTION TO MODIFY CONDITIONS
OF RELEASE**

Defendant Liban Alishire has taken responsibility for his criminal behavior from the very outset of this case. Less than a month-and-a-half after the indictment was unsealed, Mr. Alishire proffered to the Government and admitted his involvement in federal child nutrition funds fraud. A few months later, in January 2023, he pleaded guilty. The Government's position here—that Mr. Alishire's return from his proposed trip to Kenya cannot be assured—does not even attempt to grapple with the reality that from the outset of this matter Mr. Alishire has focused on accepting responsibility for what he did wrong and readying himself for the new chapter that he wants to start here when his sentence is completed. Instead, the Government suggests that Mr. Alishire poses an unacceptable flight risk, despite its agreement permitting a defendant in another Feeding our Future case (someone *who has a much greater risk of flight along the very factors the Government cites*) to travel to Somalia and Saudi Arabia. The idea that Mr. Alishire's return cannot be assured is empty—he has no incentive to flee (just the opposite in fact), his behavior over the

past year demonstrates that he has no intention to do so, and appropriate measures could be taken to minimize any real concerns the Government or the Court has. Respectfully, Mr. Alishire's motion to modify the conditions of his release so that he may travel to Kenya to help sell the key assets at a *reasonable* valuation so that he may better, meaningfully, satisfy his restitution obligations should be granted.

## I.      Mr. Alishire's behavior for the last year demonstrates his acceptance of responsibility and lack of intent to flee.

In its opposition to Mr. Alishire's travel, the Government does not once mention his *immediate* and *consistent* acceptance of responsibility for his offenses—arguably the most important fact any criminal defendant could offer. (*See* Response to Defendant's Motion to Modify Conditions of Release ("Govt's Resp. Mem.") at 4 (Oct. 16, 2023) [ECF No. 126].) Nor could the Government possibly argue otherwise. The indictment issued against Mr. Alishire (and co-defendants) was unsealed on September 20, 2022. (*See* Order to Unseal (Sept. 20, 2022) [ECF No. 10].) After being briefly detained, Mr. Alishire was released on September 26, 2022 on his own recognizance. (Order Setting Conditions of Release at 6 (Sept. 22, 2022) [ECF No. 22].)

*Only six weeks later*, on November 10, 2022, Mr. Alishire met with the Government for a proffer session in which he admitted his involvement in the fraud scheme. He admitted that, while he had long been involved in numerous legitimate lines of business, his involvement in the federal child nutrition program starting in 2021 had been fraudulent essentially from its inception. He admitted that he had been greedy and had made exceedingly bad decisions. He was an open book, and fully took

2

responsibility for what he had done. Of the numerous defendants in the Feeding our Future set of cases, few (if any) could have more swiftly and credibly accepted responsibility for what they did in their very first meeting with the government.

On January 24, 2023 Mr. Alishire then pleaded guilty to two counts of the indictment, conspiracy to commit wire fraud and money laundering, as part of a plea agreement. (Change of Plea Hearing Minutes (Jan. 24, 2023) [ECF No. 69]; Plea Agreement and Sentencing Stipulations (the "Alishire Plea Agreement") (Jan. 24, 2023) [ECF No. 70].) Other than defendants who were part of the investigatory stage of the Feeding Our Future set of cases, Mr. Alishire was one of the quickest defendants to accept responsibility for the offense and to plead guilty. This unacknowledged history materially distinguishes Mr. Alishire from his co-defendants and the vast majority of the other defendants indicted in this widespread fraud.

The reason that the Government does not mention any of this in its responsive brief is obvious—the idea that Mr. Alishire would immediately accept all responsibility for his offenses, and then attempt to flee a year later defies logic. (*See* Govt's Resp. Mem. at 4.) The Government observes, correctly, that Mr. Alishire "faces a Guidelines range of 41 to 51 months" per his plea agreement. *Id.* at 3. It further argues that this "lengthy prison sentence" will cause him to flee. *Id*. at 3–4. But if that were true, why would Mr. Alishire have agreed to the plea in the first place? From the beginning, he entered into that plea agreement fully understanding what the Guidelines recommendation contained and the shortened timeline until incarceration

that would result. The very idea that he did so only to engage in a self-destructive escape attempt almost a year later is bizarre.

Mr. Alishire is not going to flee. He has built his life in Minnesota. His wife and child are here. And they are expecting a second child in April.  Any suggestion that Mr. Alishire intends to leave his wife and child behind should not be accepted. But if necessary, his wife is willing to surrender her passport for the duration of Mr. Alishire's travel.

Mr. Alishire is awaiting sentencing. He is going to accept the sentence given to him by the Court, serve that sentence honorably, and return to rebuilding—*in the right way*—the life he has been building in Minnesota for more than a decade. Mr. Alishire's decision to accept responsibility for what he did wrong from the outset was his very first step in the new life he is already creating for himself and his family. And allowing Mr. Alishire to negotiate directly with the potential buyers of the two keys assets that can largely fund his substantial restitution obligations maximizes his chance of starting over.[1]

---

[1] Mr. Alishire has been urging the Government to allow him to sell his properties and apply the proceeds against his restitution obligations for nearly this entire calendar year. (*See* Declaration of Matthew Forsgren ¶¶ 2–5 (Sept. 27, 2023) [ECF No. 124].) Those conversations have occurred periodically over the course of months, and it was represented to Mr. Alishire that conversations would be had regarding a process for receiving approval from officials in the Department of Justice. (*Id.*) Yet the Government now makes no mention of these conversations.

 Given that buyers would surely understand and take advantage of the need to liquidate the properties—whether carried out by the Government or Mr. Alishire—to make restitution, it was always going to be challenging to receive fair market value for them. The passage of time, now approaching nearly a year, only heightens this dilemma. Mr. Alishire's

II.   **The Government's assertions regarding Alishire's purported motive and ability to flee are undermined by its agreement to similar travel by individuals with greater incentive to flee.**

The Government's belief regarding the flight risk that Mr. Alishire poses is difficult to square with its expressed position as to other defendants in the Feeding our Future set of cases. In particular, on September 26, 2023, Ms. Sahra Nur's travel to Somalia and Saudi Arabia was not opposed by the Government and was granted by this Court. (*See* Amended Order Granting Motion for Travel Outside Minnesota, *United States v. Nur*, Case No. 22-cr-224(2) (Sept. 26, 2023) [ECF No. 166].) Mr. Alishire does not dispute that the Government is free to make its judgments regarding flight risk on the basis of numerous factors that it considers appropriate. But it is nevertheless striking that when one compares Mr. Alishire's circumstances *along the factors articulated by Government* in its opposition to his travel, Mr. Alishire is clearly less of a flight risk.

By way of comparison, on September 7, 2023, Ms. Nur pleaded guilty to conspiracy to commit wire fraud and money laundering in one of the related cases, the same offenses as did Mr. Alishire. (*See* Change of Plea Hearing, *United States v. Nur*, Case No. 22-cr-224(2) (Sept. 7, 2023) [ECF No. 159]; Plea Agreement and Sentencing Stipulations (the "Nur Plea Agreement"), *United States v. Nur*, Case No. 22-cr-224(2) (Sept. 7, 2023) [ECF No. 160]. The company that she owned and operated received

---

personal, direct, and prompt involvement in negotiating these sales is necessary to prevent buyers from smelling desperation, if a fire sale is to be avoided.

many times the proceeds of the entity Mr. Alishire controlled. (*Compare* Alishire Plea Agreement at 4 ($1.7 million in meal service payments) *with* Nur Plea Agreement at 2–4 ($6.8 million in meal service payments and over $10 million in fraudulent vendor payments).) She faces a larger Guidelines range. (*Compare* Alishire Plea Agreement at 7 (41 to 51 months) *with* Nur Plea Agreement at 8 (51 to 63 months).). She was much slower to accept responsibility in her case than was Mr. Alishire—she pleaded guilty after roughly a year whereas Mr. Alishire did so after only a few months. (*See* Change of Plea Hearing, *United States v. Nur*).

These are many[2] of precisely the same factors the Government identified in opposing Mr. Alishire's request. It reasoned "Mr. Alishire has motive to flee. He has been convicted of carrying out a multi-million dollar fraud and faces the prospect of a lengthy prison sentence." (Govt's Resp. Mem. at 4.) But Ms. Nur was convicted of a larger fraud and faces the prospect of a longer sentence—clearly, these are not the determining factors in the Government's considerations, since her travel was nevertheless approved. The Government further notes that Mr. Alishire has ties to Kenya, which is of course true.[3] But while Mr. Alishire is not aware of the nature of

---

[2] The *only factor cited* by the Government that is not either identical or worse in the case of Ms. Nur is that Mr. Alishire's daughter from a previous marriage is in neighboring Uganda, as he disclosed to the Government and to the Court. Mr. Alishire's daughter lives in Minnesota, and is simply in Uganda to visit her grandparents. But Mr. Alishire's current wife, who is expecting, and their son are and will remain here in Minnesota. As discussed below, she is willing to forfeit her passport to the Government for any duration of Mr. Alishire's travel.

[3] It is strange that the Government considers the risk of flight to be "heightened here in light of Alishire's significant ties to Kenya." (Govt's Resp. Mem. at 4.) Defendants asking

Ms. Nur's contacts with Somalia and Saudi Arabia, it is doubtful that she is going to those countries to sightsee.

Again, Mr. Alishire does not raise these points to dispute the fact that the Government is free to make its own judgments regarding flight risk. But the difficulty required to reconcile the Government's own arguments with its approval of Ms. Nur's trip only a few weeks ago is notable. The Government's reasons for approving Ms. Nur's trip were presumably well founded and well considered, which only strengthens the notion that Mr. Alishire does not pose a risk of failing to return.

### III. Reasonable measures can be taken to further lessen any concerns of the Government or the Court.

Finally, the Government's brief devotes not a single word to considering whether there are any measures that can be taken to further alleviate any concerns that the Government has regarding Mr. Alishire's return for sentencing. For the reasons articulated above, Mr. Alishire does not pose a flight risk and further measures are not *required*. But Mr. Alishire would nonetheless be more than willing to submit to additional measures should they assuage any concerns that the

---

for permission to travel abroad almost always have ties to the country they are requesting permission to travel to—that is why they are asking to travel to them. It makes little sense for ordinary ties, of the sort present in nearly all such requests, to contribute much if anything to the risk calculus.

Here, the Government's argument that Mr. Alishire has "significant ties to Kenya" appears to be based solely on the two properties he owns there, (*id.*), even though selling those two properties *is the express reason* he has asked for permission for the proposed travel*.*

Government or Court has regarding the proposed travel. Potential measures could include:

   (1)   Mr. Alishire's wife could surrender her passport prior to Mr. Alishire's departure and until his return—she has confirmed that she is willing to do so;

   (2)   He could wear a GPS-monitoring device;

   (3)   He could stay in Government approved lodgings, and check-in with the U.S. Probation Office from those lodgings as often as requested;

While these measures are not necessary to ensure Mr. Alishire's return, any one or a combination of them could be implemented if necessary and would further diminish any remaining concern of Mr. Alishire's nonappearance.

## CONCLUSION

For the foregoing reasons, Mr. Alishire's motion to modify his conditions of release to permit his proposed travel to Kenya should be granted.

**FORSGREN FISHER McCALMONT DeMAREA TYSVER LLP**

Dated:  October 19, 2023

*s/ David J. Wallace-Jackson*
Matthew D. Forsgren, Reg. No. 0246694
David J. Wallace-Jackson, Reg. No. 0288767
Caitlinrose H. Fisher, Reg. No. 0398358
1500 Capella Tower
225 South 6th Street
Minneapolis, MN 55402
(612) 474-3300
mforsgren@forsgrenfisher.com
dwallace-jackson@forsgrenfisher.com
cfisher@forsgrenfisher.com

*Attorneys for Defendant Liban Yasin Alishire*