UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-222(1) (NEB)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **GOVERNMENT'S POSITION** |
| v. | ) | **REGARDING SENTENCING** |
| | ) | |
| LIBAN YASIN ALISHIRE, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys, Daniel N. Rosen, United States Attorney for the District of Minnesota, and Matthew C. Murphy and Rebecca E. Kline, Assistant United States Attorneys, submits the following sentencing memorandum and respectfully requests that the Court impose a sentence of 41 months in prison.

## THE OFFENSE CONDUCT

Defendant Liban Yasin Alishire owned and operated Community Enhancement Services Inc. ("CES"), a Federal Child Nutrition Program meal distribution site sponsored by Feeding Our Future. Alishire and his co-defendants Khadar Adan and Ahmed Ali also owned and operated Lake Street Kitchen, another Federal Child Nutrition Program meal distribution site sponsored by Feeding Our Future. Both CES and Lake Street Kitchen were in the JigJiga Business Center, a cultural mall located in Minneapolis that Adan owned. Alishire also created Ace Distribution Services Inc., a fake food distribution company that purported to provide the food that CES and Lake Street Kitchen claimed to serve to children.

Beginning in December 2020, Lake Street Kitchen began submitting fraudulent meal reimbursement claims to Feeding Our Future, alleging to have served 300 meals to children a day, seven days a week. The claims were supported by fraudulent meal counts, attendance rosters, and invoices from Ace Distribution Services. By April of 2021, Lake Street Kitchen claimed to have served a total of over 70,000 meals to children, for which it received over $180,000 in Federal Child Nutrition Program funds. Rather than use this money to feed children, Alishire and his co-defendants transferred almost all of it into their personal bank accounts. Alishire used some of the fraud proceeds to pay kickbacks to Feeding Our Future employees to ensure his claims were approved and submitted to the Minnesota Department of Education for reimbursement.

When Program rules changed to require that meal distribution sites be operated by non-profit entities, Alishire began using CES to defraud the Program. Beginning in February 2021, Alishire began submitting fraudulent meal reimbursement claims to Feeding Our Future alleging to have served 2,700 meals to children each day, seven days a week. As with Lake Street Kitchen, CES's meal reimbursement claims included fake meal counts, attendance rosters, and invoices from Ace Distribution Services. Between February 2021 and October 2021, CES falsely claimed to have served more than 800,000 meals to children, for which it received more than $1.6 million in Federal Child Nutrition Program funds. Alishire also submitted fraudulent meal reimbursement claims to Feeding Our Future on behalf of Ace Distribution services, alleging to have served 1,000 lunches to children

every day at CES during the month of July 2021, for which it received more than $150,000 of Federal Child Nutrition Program funds.

Alishire laundered the fraud proceeds received by CES and Ace Distribution Services through shell companies he and his codefendants controlled, including Hoodo Properties, through which Alishire purchased a resort property in Kenya.

Through their fraudulent scheme, Alishire and his co-defendants claimed approximately $2,472,576 in Federal Child Nutrition Program funds, of which $1,783,786 was paid out. Alishire received $712,084 of those fraud proceeds personally and through the entities he controlled.

Alishire was charged by indictment on September 1, 2022, with conspiracy to commit wire fraud, wire fraud, conspiracy to commit federal programs bribery, and money laundering. On January 24, 2023, Alishire pleaded guilty to conspiracy to commit wire fraud and money laundering.

## SENTENCING RECOMMENDATION

In *Gall v. United States*, the Supreme Court set forth the appropriate sentencing methodology. 552 U.S. 38, 49–50 (2007). The district court should first calculate the advisory Sentencing Guidelines range. *Id*. at 49. After calculating a defendant's advisory Sentencing Guidelines range and hearing from the parties, the district court must then consider the sentencing factors set forth in 18 U.S.C. § 3553(a) and make an individualized assessment based on the facts in arriving at an appropriate sentence. *Id*. at 49–50; *see also United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should

3

first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors.").

## A.     Sentencing Guidelines Range

The government agrees with the Sentencing Guidelines calculation contained in the Presentence Report, except to the extent it applied a 2-level increase pursuant to U.S.S.G. § 2B1.1(b)(12). Although the government does not dispute that guideline applies, it was not contemplated by the parties in the plea agreement. Ultimately, however, the Guidelines Range calculated by the parties in the plea agreement and in the PSR are the same because the PSR also includes a 2-level reduction pursuant to U.S.S.G § 4C.1.1, which also was not contemplated by the parties in the plea agreement. Accordingly, the government agrees that the total offense level is 22, the defendant falls into criminal history category I, and the advisory Guidelines range is 41 to 51 months' imprisonment.

## B.     Section 3553(a) Sentencing Factors

Section 3553(a) requires the Court to analyze several factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a).

4

1.    **Nature and Circumstances of the Offense**

Alishire was an active and early participant in one of the largest fraud schemes in the history of the District of Minnesota, and the single largest Covid-19 fraud scheme in the country. He took money intended to feed children who no longer could get regular, nutritious meals at school, and used it to enhance his lifestyle, including purchasing a new boat, a new car, and a beach resort property in Kenya. Alishire first participated in the Feeding Our Future fraud scheme through his for-profit restaurant, Lake Street Kitchen, but when the Minnesota Department of Education attempted to curb fraud in the program by requiring meal distribution sites be run by non-profit entities, he pivoted and enrolled his non-profit entity Community Enhancement Services into the Program. Ironically, Alishire used his non-profit to increase the scale of his fraudulent activity, using it to obtain more than $1.6 million in Federal Child Nutrition Program funds. Simply put, he took advantage of a once-in-a-century global pandemic and the generosity of American taxpayers to enrich himself.

2.    **History and Characteristics of the Defendant**

Alishire was born in Somalia in 1980. His father died when he was just four years old, and he immigrated to the United States when he was 13. He attended high school in Virginia, and took some college courses in Arizona, before relocating to Minnesota in 2025. He has operated the JigJiga Event Center since 2014, and at times operated an autism center and an adult daycare business. He is married and has three children.

**3.      Deterrence, Respect for the Law, Just Punishment, and Protecting the Public**

The Court must also consider the need for the sentence to afford adequate deterrence, promote respect for the law, provide just punishment, and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a).

Alishire's crime must be viewed in context of the rampant fraud that has plagued Minnesota in recent years. Unprecedented levels of fraud perpetrated on public benefits programs in Minnesota have eroded trust in the government and raised questions about the sustainability of those programs. Too many people, Alishire included, participate in this kind of fraud because, as they see it, everyone else is doing it. This cynical view must be stopped. It has undermined and endangered important government programs as well as legitimate nonprofit organizations that rely on donations to carry out actual charitable work. Would-be fraudsters must understand that there are serious consequences for their actions. Until the risks of stealing from the public fisc outweigh the potential reward, fraud in Minnesota will continue.

Alishire's own history also suggests that a significant sentence is needed to provide specific deterrence. Alishire created two Federal Child Nutrition Program meal distribution sites at the same time he operated an autism center and an adult daycare—two industries that are at the heart of Minnesota's massive Medicaid fraud schemes. Those are odd businesses for someone who ostensibly operates a wedding and event center to open, except that they each represent common instrumentalities

of social services fraud. Mr. Alishire also adapted his fraud scheme to get around new rules intended to stop fraud, including enrolling a not-for profit in the Federal Child Nutrition Food Program after his for-profit restaurant was disqualified from the program. Given this history and these circumstances, a meaningful sentence will serve to dissuade Alishire from participating in similar fraud schemes in the future.

### 4.     The Need to Avoid Unwanted Disparities

Finally, the Court must consider the need to avoid unwarranted disparities. 18 U.S.C. § 3553(a). As noted in the PSR, defendants sentenced within the past four years under the same Guidelines provision, with the same offense level and criminal history as Alishire, received an average sentence of 33 months. Considering the egregious nature of Alishire's fraud, a 41-month sentence is not unwarranted. It also is consistent with the 43-month sentence imposed on Sharon Ross, who had a similar loss amount, was an average participant, and who pleaded guilty before trial.

### <u>CONCLUSION</u>

For the reasons stated above, the government respectfully requests that the Court impose a sentence of 41 months in prison.

Respectfully Submitted,

Dated: April 7, 2026,

DANIEL N. ROSEN
United States Attorney

 /s/ *Matthew C. Murphy*
BY:   MATTHEW C. MURPHY
REBECCA E. KLINE
Assistant U.S. Attorneys

7